IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SAMUEL A. TEAGUE,

                          Plaintiff,                    OPINION AND ORDER

    v.

                                                    18-cv-126-wmc

DOCTOR HOFFMAN and
NURSE STECKER,

                         Defendants.

In this case, plaintiff Samuel Teague, an inmate at the New Lisbon Correctional Institution ("NLCI"), claims that he received inadequate medical attention after suffering a leg injury while playing basketball. In an initial screening order, this court permitted plaintiff to proceed on claims for deliberate indifference under the Eighth Amendment and medical malpractice under Wisconsin law against defendants Karl Hoffman and Kimberly Stecker, who were both employed by the Department of Corrections ("DOC") as health care workers and who treated Teague at NLCI after his injury. (Dkt. #9.)

Defendants now move for summary judgment. (Dkt. #21.) Plaintiff has also filed motions for assistance in recruiting counsel and a court-appointed expert witness. (Dkts. #27, 28.) For the reasons that follow, the court will deny both of plaintiff's motions and grant summary judgment in favor of defendants.

## UNDISPUTED FACTS[1]

### A. Knee Injury and Initial Treatment

---

[1] The following are, for purposes of summary judgment, the undisputed facts viewed in a light most favorable to plaintiff as the non-moving party. At the outset, the court must address two general objections lodged by defendants against certain facts proposed by plaintiff. First, defendants object

At all times relevant to this lawsuit, plaintiff Samuel Teague was incarcerated at NLCI, and defendants Kimberly Stecker and Karl Hoffman were employed there as a nurse clinician and a physician, respectively.  On July 30, 2017, Teague injured his left knee and calf while playing basketball.  Because he was unable to get to the Health Services Unit ("HSU"), Nurse Stecker was called to Teague's unit to examine him.  Teague informed Stecker that his left foot "went under him," causing his left knee to hyperextend.  He was then placed in a wheelchair and transported to the HSU.

The parties submit conflicting evidence regarding Nurse Stecker's initial examination of Teague and the symptoms that he presented.  In his declaration, Teague testified that:  (1) his left leg was swollen and disfigured, he had no feeling in his left foot, and he was in excruciating pain; (2) he told Stecker that he was in pain and that he had

---

to a number of plaintiff's proposed facts on the grounds that the underlying evidence was illegible. (*See, e.g.*, Defs.' Resp. to Pl.'s PFOFs (dkt. #53) ¶¶ 47, 50, 51.)  However, on July 6, 2020 -- well before defendants' July 27, 2020, deadline to respond to plaintiff's proposed findings of fact -- plaintiff submitted new versions of his exhibits.  (*See* dkt. #47.)  Thus, to the extent that plaintiff ultimately provided legible copies of the exhibits, the court overrules defendants' objections regarding the illegibility of the underlying evidence.  Second, defendants object to some (but not all) of plaintiff's proposed facts related to treatment he received after July 30, 2018, and July 31, 2018, on the grounds that those facts go beyond the scope of plaintiff's complaint as authorized by the court's screening order.  It is true that the court wrote the following in its earlier screening order:

> The court also notes that plaintiff has failed to explain how defendants contributed to his September 26, 2017, fall and additional injury to his knee. Unless Dr. Hoffman failed to approve him for surgery, it is not clear how that subsequent event implicates either defendant. As such, from the court's review of plaintiff's complaint, his deliberate indifference claim is limited to defendants' treatment of his knee injury on July 30 and 31.

(Order (dkt. #9) 5 n.4.)  Given the court's limitation, plaintiff technically should have amended his complaint in order to pursue claims of mistreatment beyond the July 30 and 31 treatment window authorized by the screening order.  Still, in light of plaintiff's *pro se* status and the absence of prejudice to defendants, the court has considered all relevant and admissible facts presented that relate to any alleged mistreatment of Teague's knee injury, even those beyond the July 30 and 31 treatment window.

2

heard a loud pop; (3) Stecker had him sit up for "what seemed like an hour," told him to just walk on his leg, and said he "acted like a drama Queen"; and (4) Teague asked to go to a hospital, but Stecker sent him back to his unit.  In contrast, defendants rely on defendant Stecker's notes in a "Nursing Encounter" record, as well as her declaration, in which she noted that:  (1) there was no swelling or abnormalities in Teague's left knee or ankle; (2) Teague denied being in pain; and (3) he had full range of motion ("ROM") in his left foot.  Stecker also notes that after her initial assessment of Teague, she waited 15 minutes then assessed him again; at which point, there was still no swelling or deformities, Teague again denied pain, and he did not complain of creaking, cracking, or popping.

During this first visit, the parties also dispute whether Nurse Stecker told Teague to walk on his injured leg.  Teague represents that Stecker told him to stand on his leg without even asking him if he could bear weight on it; and even after Teague told her that he could not put weight on it, she still told Teague to just walk on it.  For her part, Stecker declares that:  (1) she asked Teague if he could bear weight or walk on his leg; (2) Teague was able to walk on his leg in the HSU; and (3) she did not require him to walk on his leg.

Regardless, the parties agree that Nurse Stecker then provided Teague with crutches, and she recommended (1) recreation and lower bunk restrictions, (2) Ibuprofen for pain and inflammation, although Teague did not receive actually pain medication until almost two hours after his injury, and (3) ROM exercises.  Stecker also told Teague to submit a Health Services Request ("HSR") if there was no improvement with his leg or if he felt it was getting worse, and she scheduled a follow-up nursing appointment for the next day.  Beyond a crutch, Teague was not provided with a splint, ace bandage, ACL-

3

Brace, or any other medical device.  Based on her initial exam, Stecker reportedly did not think that there was a need to consult with the on-call doctor, believing instead that (1) Teague was suffering from an ankle sprain or strain and (2) the treatment she provided was adequate.[2]

Walking back to his unit after this initial HSU visit, however, Teague reports falling several times and being in severe pain.  Approximately three hours after his injury -- around 7:35pm -- Teague returned to the HSU because he was in severe pain.  Nurse Stecker again examined Teague, and this time she noted swelling, tenderness, muscle cramps/spasms, and ROM limitations, as well as circulation, motion, and sensation abnormalities.  However, the parties continue to dispute starkly whether Teague reported he was in pain:  Teague testified that he told Stecker he was in "excruciating pain," while Stecker's contemporaneous "Nursing Encounter" record and declaration reflect that Teague denied being in pain.  Teague also testified that Stecker again told him to try to walk on his leg, while Teague told Stecker that he could not do so.  Stecker counters that she did not request Teague walk after he reported being unable to do so.

Based on her second assessment, Stecker recommended that Teague be taken to the Mile Bluff Medical Center Emergency Room for further evaluation.  Although Stecker never attempted to consult with a doctor before this referral, defendants explain that:  (1) Stecker did not do so because there was no physician at NLCI on July 30, 2017 (it being a Sunday); (2) Stecker did not consult with the on-call doctor because she felt that the

---

[2] Presumably based on his version of the injuries presented, Teague purports to question Stecker's testimony as to her own, initial beliefs regarding Teague's injury.

decision would be the same (to send Teague to the emergency room); and (3) as a registered nurse, Stecker could make the decision the send an inmate to the emergency room without physician approval.  Finally, although Stecker did not perform a "drawer test" on Teague, defendants explain that such a test would not be within Stecker's scope of practice as a nurse.[3]

Approximately six hours after his injury -- around 10:22pm -- Teague was assessed at the Mile Bluff emergency room by Dr. Paul Rudy, who diagnosed a partial tear of his left calf muscle.  Dr. Rudy then instructed Teague to take Tylenol or Motrin as needed for pain, as well as to ice the injury.  Finally, Dr. Rudy told Teague that his injury would heal slowly over the next four to six weeks and that he may follow-up with his primary care provider the following week.

### B.  Follow-Up Diagnosis and Treatment

The following day, July 31, 2017, around 8:40am, Teague met Dr. Hoffman, who reviewed Stecker's Nursing Encounter and Progress Notes, Dr. Rudy's exam notes, and Teague's x-ray results from his visit to Mile Bluff.  During his appointment with Dr. Hoffman, Teague also expressed his concern with how "hugely swollen" his left calf appeared, as well as the fact that his left foot could not be flexed and was numb at the top.

---

[3] An anterior-posterior drawer test "involves pulling the tibia forward and backwards to assess for laxity, or excess mobility, which would indicate an ACL [i.e., anterior cruciate ligament] tear." (Defs.' PFOFs (dkt. #23) ¶ 24.)

Suspecting an injury to his common peroneal nerve, Dr. Hoffman then ordered an MRI of Teague's lower left leg and knee.

At that time, Dr. Hoffman did not know the severity of Teague's injuries, but at least knew that the knee was involved based on the mechanism of the injury and the peroneal nerve was damaged.[4]   In addition to the MRI, therefore, Dr. Hoffman ordered Teague:  (1) a knee immobilizer (although it appears that this was not actually *issued* to Teague until August 7); (2) crutches for short distances and a wheelchair for long distances; (3) a physical therapy consult; (4) a lower-bunk and lower-tier restriction for two months; (5) 500mgs of Vitamin C for tissue healing for the next three months; and (6) a follow-up appointment for August 4, 2017.

Still, Dr. Hoffman did not perform a drawer test, apply an ACL brace, or apply an ACE bandage.  According to Dr. Hoffman, he did not perform a "drawer test" because:  it would have been painful with an acute injury; the swelling could falsely stabilize the joint; and the outcome of the test would not affect his decision to order an MRI.[5]   Teague testified that Dr. Hoffman instructed him to walk on his leg, while Hoffman avers that he did not require Teague to walk or bear weight on his injured leg, something seemingly confirmed by his ordering crutches and a wheelchair.

---

[4] In responding to defendants' proposed findings, Teague argues that Dr. Hoffman only knew the "severity of his leg after [my] MRI was [d]isclosed to him," but this does not contradict Hoffman's *impressions* before the MRI.  (*See* Defs.' Reply to Pl.'s Resp. to Defs.' PFOFs (dkt. #52) ¶ 23.)

[5] Teague would dispute this, but offers no contradictory evidence, and instead only protests that "expert testimony would [be] needed to confirm or reject Defendant[s'] assertions."  (Pl.'s Resp. to Defs.' PFOFs (dkt. #31) ¶ 24.)

On August 4, 2017, just five days after his original injury, Teague underwent an MRI at Mile Bluff, which confirmed that he had suffered from a hyperextension injury and common nerve palsy. The MRI further showed: a possible avulsion of the peroneal nerve; total disruption of the biceps femoris, lateral collateral ligament, and anterior cruciate ligament; and a partial or second-degree tear of a medial collateral ligament. Two days later, Teague was seen at the HSU for left leg swelling, almost no ROM in his left foot, edema, and leg pain. After consulting with Dr. Wheatley, the on-call doctor, Registered Nurse Rink had Teague transported back to Mile Bluff for further evaluation.

On August 7, 2017, because of the complex nature of Teague's injury and out of concern that Teague's leg was still swollen and painful, Dr. Hoffman next prescribed 100mgs of Tramadol once a day for two weeks for pain, ordered an ultrasound and second round of x-rays, and requested a consultation with the University of Wisconsin ("UW") Sports Clinic. In addition, that same day, a physical therapist, Dr. Phil Hoescht, issued Teague a knee immobilizer, instructing him to wear it in the locked position until his UW Health orthopedic appointment.

The very next day, August 8, Teague had a follow-up appointment with Dr. Hoffman. Although Dr. Hoffman responded in writing to several of Teague's subsequent HSRs and also ordered adjustments to his prescriptions, August 8 appears to be the last time Dr. Hoffman saw Teague in person until after his November 10, 2017, surgery. For example, on August 10, in response to an HSR in which Teague complained of being in pain, Dr. Hoffman increased his Tramadol prescription to 100mgs twice a day for one

month.  Dr. Hoffman also requested that this prescription be delivered to NLCI as quickly as possible, although it was still "several days" before Teague received it.

On August 14, after Teague complained in another HSR that his wheelchair and shoe were improper, an HSU nurse informed him that he was scheduled to see an orthopedist shortly.  That same day, Teague was also fitted for an ankle-foot orthosis ("AFO") for his foot drop.  Because Teague was unable to wear a shoe, however, Dr. Hoffman determined that an AFO was not a good option after consulting with physical therapist Hoescht, and instead decided to defer to UW Health's opinion as to the best way to control Teague's foot drop.

On August 16, Teague submitted another HSR complaining of pain and the wait for what he expected would be knee reconstruction surgery.  The following day, Dr. Hoffman replied that UW Health knew about his case, but that ligament tears are not considered an emergency and that "they would not rush you [Teague] to surgery for the nerve."  (Simcox Decl., Ex. 1000-0189 (dkt. #26-1).)[6]  Even so, on August 18, Hoffman increased Teague's Tramadol prescription to 100mgs, four times a day for one month.

Despite this increase, Teague again complained in an August 21 HSR that he was prescribed pain medication every eight hours, but that it was not "document[ed] with the proper medical staff," and that he was in pain at night.  However, HSU Nurse Dobbert

---

[6] Teague attempts to dispute Dr. Hoffman's characterization, arguing that ligament and nerve tears *are* emergencies, citing in support an article published by UW Health Sports Rehabilitation, which explains that "[o]ften vascular or nerve injuries require emergency attention."  (*See* Pl.'s Resp. to Defs.' PFOFs (dkt. #31) ¶ 33 (citing Ex. 33 (dkt. #47-34)).)  Of course, emergency medical *attention*, which Teague unquestionably received, and emergency surgery are not necessarily the same thing.

responded that same day by assuring Teague that he was scheduled to see an offsite orthopedist later that day; and in fact, Teague was seen as promised by Dr. Geoffrey Baer at UW Health Orthopedics on August 21. Dr. Baer determined that Teague would need reconstructive left knee surgery. He further instructed Teague to perform ROM exercises.[7]

The following day, August 22, Dr. Hoffman ordered that Teague's surgery should be arranged with UW Health. He also renewed Teague's Tramadol prescription in anticipation of that surgery. A few days later, Dr. Hoffman further prescribed Aspirin to avoid blood clots, and he ordered that Teague could attend recreation for upper body exercises. In another HSR, dated August 22, Teague complained that Nurse Stecker denied him "meds" and reported that he was in pain. Nurse Dobbert wrote back later the same day advising Dr. Hoffman had okayed a dose to help rectify the situation.

Teague's medical records next indicate that his surgery had been scheduled by August 29. (Simcox Decl., Ex. 1000-0015 (dkt. #26-1).) More specifically, those records state that the "surgery is scheduled quite a ways out," but that "Dr. Hoffman is trying to get it moved up sooner." (*Id.*) On August 31, records further show that Dr. Hoffman spoke with Dr. Baer about the upcoming surgery, as an orthopedic specialist, Dr. Baer was the physician scheduled to perform (and ultimately did perform) Teague's surgery. Although these August medical records do not indicate the date surgery had been scheduled, later records show that Dr. Baer did in fact perform the surgery on November 10, 2017. The medical records also reflect that Dr. Baer opined an additional wait time

---

[7] Medical records from that appointment also reflect that Dr. Baer was unable to obtain a "drawer test." (*See* Simcox Decl., Ex. 1000-0097 (dkt. #26-1).)

before the surgery was appropriate because (1) the tissue surrounding Teague's joints would be less swollen, and (2) Teague's common peroneal nerve would hopefully recover better if stretched and not torn.  In response to an HSR on September 4, 2017, Dr. Hoffman generally explained the same to Teague, writing that "while [his] concerns about the nerve are legitimate," earlier surgery would not help.  (Ex. 15 (dkt. #47-15).)

By this time, however, Teague counters that his swelling had already been greatly reduced, and he also asserts that his "common peroneal nerve was shown to be torn as opposed to being stretched."  (Pl.'s Resp. to Defs.' PFOFs (dkt. #31) ¶ 39.)  Nevertheless, the contemporaneous MRI evidence cited by Teague does not entirely support this latter assertion.  At most, Teague's August 4, 2017, MRI from Mile Bluff showed a "*possible avulsion of the peroneal nerve.*"  (*See id.* ¶ 26 (emphasis added).)  Also, on August 31, based on Dr. Baer's recommendation, Dr. Hoffman ordered ROM exercises as physical therapy pending Teague's surgery.  Finally, Teague references what appears to be a letter he wrote to Dr. Hoffman on September 3, 2017, in which Teague complains about his continued pain, ineffective pain medication, and delays in his treatment.[8]

---

[8] Plaintiff's proposed finding of fact actually reads:  "Plaintiff[']s letter to Dr. Hoffman explaining []the delays, pain, and ineffective pain meds.  Exhibit-14."  (Pl.'s PFOFs (dkt. #32) ¶ 49 (citing Ex. 14 (dkt. #47-14)).)  Defendants rightly object to the court's consideration of this letter on two grounds: (1) the letter was not properly authenticated, and (2) no evidence was introduced to show that the letter was sent to Dr. Hoffman.  Further, defendants contend that without supporting evidence the letter is not relevant.  (Defs.' Resp. to Pl.'s PFOFs (dkt. #53) ¶ 49.).  Drawing all reasonable inferences in the light most favorable to plaintiff as the non-moving party, and also generously construing plaintiff's summary judgment materials in light of his *pro se* status, the court will overrule defendants' objections.  The letter itself along with plaintiff's signed proposed findings of fact adequately make the required prima facie showing that the document is what it purports to be -- a letter from Teague to Dr. Hoffman -- and Teague's proposed fact raises the inference that it was in fact sent to Dr. Hoffman.  Regardless, at summary judgment, evidence need only be admissible in content, not in form. *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016).  Accordingly, in an abundance of caution, the court has considered the letter in

## C. Further Injury and Surgery

On September 26, 2017, before his scheduling surgery, Teague fell in the shower, apparently injuring his left leg further.  Between September 26 and October 28, 2017, Teague then submitted at least four HSR requests, all complaining of ongoing pain.  In particular, Teague complained on September 26 itself, that he had been without pain medication for a week and was now in pain.  This HSR was received by Nurse Dobbert, who responded that his renewed medication was arriving that day from the pharmacy. Then, on October 1, Nurse Stecker received Teague's follow-up HSR, which repeated that he had been in pain for the last few days, but had only been placed on "sick call."[9]  A few days later, on October 4, Dr. Hoffman received to an additional HSR that Teague  had submitted earlier that same day, complaining about his continued pain and Nurse Stecker's treatment of him.  While Dr. Hoffman wrote in response to this HSR that he would attempt to see Teague the next day, Hoffman did not see Teague until "weeks" later.  (Pl.'s Supp. PFOFs (dkt. #46) ¶ 61.)  Finally, on October 28, Teague again complained that he was in pain and was waiting to see Dr. Hoffman; in response, an HSU Nurse indicated that Teague was on the "will call" list.

Ultimately, as noted, Teague underwent left knee reconstruction surgery on November 10, 2017.  One day after his surgery, on November 11, Teague requested

---

evaluating plaintiff's claims, despite plaintiff's proposed findings of fact not being signed under penalty of perjury and not clearly authenticating the document, nor establishing that it was delivered to Dr. Hoffman.

[9] Teague did not explain what being placed on "sick call" meant, nor was the court able to find any further explanation in this record.

medication that had been prescribed to him by UW surgeon Baer after he operated on his leg.  However, Nurse Stecker declined.  The HSR reflects that Stecker's response was to tell Teague that (1) his surgeon was not a DOC provider and (2) "HSU follows DOC provider orders."  (Ex. 35 (dkt. #46-36).)[10]


OPINION

## I.  Plaintiff's motions for appointment of counsel and an expert witness

Before turning to the merits of defendants' motion for summary judgment, the court will address plaintiff's pending motions for assistance in recruiting counsel and for a court-appointed expert witness.  (Dkts. #27, 28.)  As to the former, "[a] court may request an attorney to represent any person unable to afford counsel."  28 U.S.C. § 1915(e)(1).  "[T]he decision whether to recruit pro bono counsel is left to the district court's discretion."  *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007).  As this court has previously explained, it "would recruit counsel for every pro se plaintiff who asked for one if there were enough volunteer attorneys to take on such representation.  The fact is that there are not. . . .  For this reason, the court must carefully consider each plaintiff's abilities and the complexity of the claims in determining whether to recruit counsel in any particular case."  *Coogan v. Jess*, No. 18-CV-758-BBC, 2019 WL 95628, at *1 (W.D. Wis. Jan. 2, 2019).

---

[10] In his proposed findings of fact, Teague references HSRs submitted in February and March of 2018.  However, none of these HSRs implicate the conduct of either Stecker or Hoffman, and thus are not relevant to their liability in this case.

In considering a motion to appoint counsel, a court must ask: "(1) has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself?" *Id.* Here, Teague represents that he has made various unsuccessful efforts to obtain counsel. (Pl.'s Mot. (dkt. #28) 1.) Even assuming that he has made a reasonable attempt to obtain counsel, however, Teague has not shown that he is not competent to litigate this case. On the contrary, Teague's responses to defendants' summary judgment materials are cogent, comply with the court's procedural instructions, and demonstrate a strong grasp of the legal standards and facts relevant to his claims. Thus, plaintiff's motion for assistance in recruiting counsel will be denied.

The court will also deny plaintiff's motion for appointment of an expert witness. Federal Rule of Evidence 706 allows a court to appoint a neutral expert when doing so is necessary to help the court or the jury "interpret complex information." *DeJesus v. Godinez,* 720 F. App'x 766, 772 (7th Cir. 2017). In practice, however, courts limit appointment of experts to "truly extraordinary cases." *Reilly v. United States,* 863 F.2d 149, 156 (1st Cir. 1988). In particular, appointments only occur when the court needs the expert to help understand complicated issues; the purpose is not to help one side prove its case. *Turner v. Cox,* 569 Fed. Appx. 463, 468 (7th Cir. 2014) ("A court may appoint an expert to help sort through conflicting evidence . . . but it need not appoint an expert for a party's own benefit."). Here, too, the evidence in the record adequately explains the medical facts at issue. While Teague might prefer another expert opinion in the hopes that it will provide support for his claims, that is not the purpose of Rule 706. "[N]o civil litigant, even an

indigent one, has a legal right" to compel another to "bear the cost of and responsibility for hiring an expert witness to testify on his behalf in order to establish a fundamental element of his case." *Brown v. United States,* 74 F. App'x 611, 614-15 (7th Cir. 2003).

## II. Defendants' motion for summary judgment

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating that "there is no material question of fact with respect to an essential element of the non-moving party's case." *Delta Consulting Grp., Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009) (quoting *Cody v. Harris*, 409 F.3d 853, 860 (7th Cir. 2005)).  If this showing is made, then the burden shifts to the non-moving party to submit evidence showing that there is a genuine dispute for trial.  *Id.* (citing Fed. R. Civ. P. 56(e); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 694 (7th Cir. 2006)).  When considering a motion for summary judgment, the court must examine the facts in the light most favorable to the non-moving party.  *See Sample v. Aldi. Inc.*, 61 F.3d 544, 546 (7th Cir. 1995).

In this case, defendants have moved for summary judgment on plaintiff's Eighth Amendment and medical negligence claims.  For the reasons discussed below, the court concludes that no issue of material fact exists as to Teague's Eighth Amendment claims, and defendants are entitled to judgment on these claims as a matter of law.  Moreover, because of the judicial resources that have already been expended in this case, and because the disposition of plaintiff's remaining state medical negligence claims is clear, the court

will retain its supplemental jurisdiction and grant summary judgment to defendants on those state law claims as well.

### A. Eighth Amendment Claims

The Eighth Amendment prohibits cruel and unusual punishment, imposing a duty on the government to provide medical care to prisoners. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976). To establish a violation of the Eighth Amendment, a plaintiff must show that a prison official was deliberately indifferent to his serious medical need. *See id.* This standard involves both an objective and a subjective component. *See Dunigan v. Winnebago Cty.*, 165 F.3d 587, 590 (7th Cir. 1999).

First, a prisoner must show that he suffers from an objectively serious medical condition. *Id.* For the purpose of summary judgment, defendants accept as undisputed that Teague's claims of pain and an injured left knee constitute serious medical conditions. (Defs.' Br. (dkt. #22) 7 n.1.) Thus, the court's analysis focuses on the second, subjective element, which requires the plaintiff to show that the prison official acted with deliberate indifference to these conditions. *See Dunigan*, 165 F.3d at 590-91.

Deliberate indifference means that the official knew of, yet disregarded, a substantial risk of harm to the plaintiff's health or safety. *See Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). Inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996). Said another way, "an official's failure to alleviate a significant risk that he *should* have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the

infliction of punishment" and does not amount to an Eighth Amendment violation.  *Farmer v. Brennan*, 511 U.S. 825, 838 (1994) (emphasis added).  With this standard in mind, the court turns to the Eighth Amendment claims against the two remaining defendants.

### 1. Deliberate Indifference of Defendant Stecker

The court will begin its discussion with plaintiff's Eighth Amendment claims against Nurse Stecker.  The parties starkly disagree over the timing and extent of Teague's reported symptoms, and especially his communication of pain during Nurse Stecker's initial assessment of Teague.  Considering the facts in the light most favorable to Teague as the non-movant, however, the court assumes that Teague informed Stecker during her original assessment that:  he was in severe pain; he had heard a "pop" when his leg was injured; his leg was swollen and disfigured; and he asked to go to a hospital.  The court further credits Teague's testimony that Stecker initially told him to walk on his injured leg without first asking whether he could bear weight on it.  Moreover, it is undisputed that Teague was so injured that he could not get to the HSU on his own, requiring Stecker to come to his unit to examine him and necessitating a wheelchair to be transported to the HSU.

Still, Stecker provided Teague with crutches, ibuprofen, ROM exercises, and certain activity restrictions.  She also told him to submit an HSR if his injury did not improve and scheduled a follow-up appointment for the very next day.  Further, when Teague returned to the HSU a second time, and still only three hours after his injury, Nurse Stecker sent Teague to a local emergency room, where the ER physician diagnosed Teague with a partial tear of his calf muscle, told him to ice his injury, and instructed him to take Tylenol or Motrin for pain.

16

While there may be some question as to the prudence and efficacy of Stecker's initial treatment of Teague, a "prisoner's dissatisfaction with a [medical provider's] prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (internal quotation omitted).  Here, Teague has produced no evidence that could lead a reasonable jury to this conclusion as to Nurse Stecker.  Although Teague complains that Stecker did not immediately provide him with a splint, ace bandage, ACL-brace, or medical device beyond a crutch, he produced no evidence showing that these treatments were more appropriate than the treatment she provided, much less that denial of those treatments constituted evidence of deliberate indifference to plaintiff's pain. Indeed, the fact that the independent ER physician ultimately prescribed a similar course of treatment as Nurse Stecker -- instructing Teague to ice the injury and take Tylenol or Motrin for pain -- suggests that Stecker's treatment was in fact reasonable.

While Stecker's apparent decision to tell Teague to walk on his injured leg may have been an improper request, Teague himself testifies that he responded by simply telling Stecker that he could not do so, which appears to have ended the matter.  Moreover, courts "must examine the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to his serious medical needs." *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997).  The undisputed record show that Nurse Stecker examined Teague immediately following his injury, provided him with some limited treatment, then agreed to see him again that same day, and within three hours after his injury, sent him to

the emergency room for further evaluation.  The Seventh Circuit has previously held that "a two-hour delay is not an unreasonably long wait for an x-ray, an examination, and possibly a set of a fracture." *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) (citing *Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995)); *see also Lee v. Akture*, 827 F. Supp. 556, 560 (E.D. Wis. 1993 ("[A] claim that the care an inmate received was not as quick or efficient as he would have desired does not, without more, raise his claims to the level of a constitutional violation.").

Teague also takes issue with the (undisputed) fact that Stecker did not perform a "drawer test" on Teague to assess his injury, but defendants point out that such a test is not even within her scope of practice as a nurse.  Teague has offered no evidence showing it would have been appropriate for Stecker to perform the "drawer test" on him after his injury, and certainly not that her failure to do so could be reasonably found to amount to deliberate indifference.  If anything, the fact that neither Dr. Hoffman nor Dr. Baer performed the "drawer test" when they subsequently treated Teague would seem to preclude finding Nurse Stecker's failure to perform the test unreasonable.  In sum, even viewing the evidence in the light most favorable to Teague, he has not produced adequate evidence for a reasonable jury to conclude that Stecker acted with deliberate indifference in assessing and treating him following his initial injury.

The only other evidence Teague offers against Nurse Stecker is to point generally to four HSRs from August 22, October 1, October 4, and November 11, in which he complained about the treatment he received, but these vague and sporadic complaints do no more than show that Teague was experiencing pain and disagreed with Stecker's

treatment regime.  This, too, is simply not enough to raise a reasonable inference of deliberate indifference.  *See Snipes*, 95 F.3d at 591 ("An Eighth Amendment claim requires far more than proof of disagreement with a medical professional's medical judgment. A prisoner has no constitutional right to choose his treatment.").  The court is not unsympathetic to the pain Teague experienced, but the Eighth Amendment does not "require[] prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment," *id.* at 592, much less require a nurse to override the approach and prescriptions already set by a doctor (or in this case, multiple doctors).  Accordingly, the court finds that Teague has not presented adequate evidence to create a triable Eighth Amendment claim against Nurse Stecker.

### 2.  Deliberate Indifference of Defendant Hoffman

Turning next to the Eighth Amendment claim against Dr. Hoffman, the court must again conclude that plaintiff has failed to present adequate evidence for a reasonable jury to find deliberate indifference.  Dr. Hoffman first saw Teague the morning after his injury, at which point he promptly ordered an MRI and prescribed various treatments, including a knee immobilizer and crutches.  Teague complains that Dr. Hoffman did not apply an ACL brace or apply an ACE bandage, but he produces no evidence that Dr. Hoffman's failure to provide those treatments was "so blatantly inappropriate as to evidence intentional mistreatment." *Snipes*, 95 F.3d at 592.

As with Nurse Stecker, Teague also takes issue with Dr. Hoffman's failure to perform a "drawer test" on him.  But Dr. Hoffman reasonably explained that he did not perform such a test because it would be painful with an acute injury, the swelling could

falsely stabilize the joint, and that regardless of the outcome of the test it would not have affected his decision to order to MRI.   Because Dr. Hoffman "provided a cogent, medical explanation for his decision" not to perform the test, Teague is required to "point to some evidence that would permit a reasonable jury to reject his explanation as a post hoc rationalization." *Zaya v. Sood*, 836 F.3d 800, 806 (7th Cir. 2016).   He has not done so here.   Indeed, that Dr. Baer -- an orthopedic specialist -- similarly declined to perform a drawer test on Teague only reinforces the reasonableness of Dr. Hoffman's treatment decision.

Next, Teague contends that his surgery should have been scheduled sooner, and that the delay resulted in unnecessary pain and suffering in violation of the Eighth Amendment.   Certainly, "[a] significant delay in effective medical treatment . . . may support a claim of deliberate indifference, especially where the result is prolonged and unnecessary pain." *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).   However, defendants have produced evidence that the surgery date was not unreasonably or unnecessarily delayed.   To the contrary, the day after Dr. Baer determined that Teague would need surgery, Dr. Hoffman ordered the surgery to be arranged.   Once the surgery was scheduled, the record shows Dr. Hoffman went further by consulting with Dr. Baer, who told Hoffman that "Teague's wait was appropriate because his joints would be better for surgery if the surrounding tissue was not swollen" and "Teague's common peroneal nerve would hopefully recover if it was stretched and not torn."   (Hoffman Decl. (dkt. #24) ¶ 25.)

20

While Teague argues that his surgery should have been scheduled 3 weeks, rather than 3 months, after his injury, he points only to an article from UW Health Sports Rehabilitation, which states "[r]esearch has shown that outcomes of multi-ligament reconstruction are best when the surgery is done within 3 weeks from injury after the patient can reduce the swelling from the initial injury." (Ex. 33 (dkt. #47-34) 1.) The article goes on to state that "if surgery is done immediately following the injury, an individual may experience increased post-operative stiffness and scarring." (*Id.*)

As an initial matter, it is not entirely clear that the article is discussing the same type of injury that Teague suffered. Even assuming that it is, the article itself confirms that some wait time is appropriate and that swelling should be reduced before surgery. At most, the article supports the proposition that surgery is "best" when done within 3 weeks, but the Eighth Amendment does not entitle a plaintiff "to the best care possible," only "to reasonable measures to meet a substantial risk of serious harm." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Regardless, the record shows that Dr. Hoffman promptly ordered the surgery the very next day after recommended by Dr. Baer, and that the scheduling was left to UW Health. Moreover, the record shows Dr. Hoffman went further on Teague's behalf in questioning the reason for the three month delay, ultimately deferring to the explanation provided by Dr. Baer, an orthopedic specialist, reflecting reasoned professional judgment, not deliberate indifference. *See Zaya*, 836 F.3d at 806 ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment."). Accordingly, Teague has

produced insufficient evidence for a reasonable jury to find that the delay he faced in receiving knee surgery amounted to an Eighth Amendment violation, especially by Dr. Hoffman.

Finally, Teague complains about the ineffective pain medication he received after his injury and before his surgery. While the court is also sympathetic to the suffering experienced by Teague, the Eighth Amendment does not "require[] prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment." *Snipes*, 95 F.3d at 592. Here, Dr. Hoffman provided Teague with pain medication (Tramadol) and was responsive to Teague's complaints of pain -- communicating regularly with him, increasing the medication dosages, and prescribing physical therapy. Teague's own disagreement with Dr. Hoffman's treatment plan, without more, is not enough to create a triable Eighth Amendment issue. *See Berry*, 604 F.3d at 441 ("Nether medical malpractice nor mere disagreement with a doctor's medical judgment is enough to prove deliberate indifference in violation of the Eighth Amendment."); *Carrasco-Salazar v. Fearday*, 2015 WL 468771, at *5 (W.D. Wis. Feb. 4, 2015) (explaining that the plaintiff's "disagreement as a lay person with the medical judgments made by [defendant] cannot constitute a basis for deliberate indifference, because there is no showing that the treatment provided was so blatantly inappropriate that no minimally competent professional would have so responded under the circumstances'").

## B. Medical Negligence Claim

Because defendants' motion for summary judgment as to Teague's federal claim will be granted, the court must consider whether it is appropriate to allow him to proceed

further with his state law claims of medical negligence.  The only ground for considering this state law claim is the exercise of this court's supplemental jurisdiction under 28 U.S.C. § 1367, and under § 1367(c)(3), a federal district court may decline to exercise further supplemental jurisdiction over state law claims once federal claims have been dismissed. Indeed, "the general rule is that, when all federal-law claims are dismissed before trial, the [supplemental] claims should be left to the state courts." *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994).  Nevertheless, a federal court may retain jurisdiction over the remaining state law claims in cases where the statute of limitations has run, substantial judicial resources have already been committed to resolving the pendent claims, or it is clear how the claims will be decided.  *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514-15 (7th Cir. 2009) (citing *Wright*, 29 F.3d at 1251).  Here, because judicial resources have already been committed to this case, and because it is clear that plaintiff cannot prevail on his medical negligence claims, the court will retain jurisdiction over these claims to grant summary judgment in favor of defendants.

To prevail on a medical negligence claim under Wisconsin law, a plaintiff must prove that the defendants breached their duty of medical care and plaintiff suffered injury as a result.  *See Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860. Medical malpractice cases generally require expert testimony to establish the standard of care, unless the situation is one in which common knowledge affords a basis for finding negligence.  *See Gil v. Reed*, 535 F.3d 551, 557 (7th Cir. 2008).

Although plaintiff has no expert testimony speaking to the medical standard of care, he may rely on common sense testimony from defendants' experts, including Dr. Hoffman,

Dr. Baker, and Nurse Stecker.  *See id.* ("[N]othing in Wisconsin law prevents a plaintiff from relying on the defendant . . . or the defendant's agents . . . to supply evidence regarding the appropriate standard of care.") (quoting *Gil v. Reed*, 381 F.3d 649, 659 (7th Cir. 2004)).  However, none of the record evidence in this case supports Teague's argument that defendants breached their medical duty of care.  On the contrary, defendants have consistently stood by their treatment decisions, and none of the other medical providers who treated Teague ever appear to have questioned the care that he received.  The only evidence that *arguably* cuts in favor of Teague's negligence claim is the fact that Dr. Hoffman initially expressed some concern about the late date of Teague's surgery, but the record shows that after consultation with Dr. Baer -- a specialist and Teague's surgeon -- Dr. Hoffman was satisfied that the later surgery date was appropriate.

Finally, where the "errors were of such a nature that a layperson could conclude from common experience that such mistakes do not happen if the physician had exercised proper skill and care," *Gil*, 381 F.3d at 659 (citing *Christianson v. Downs*, 90 Wis. 2d 332, 279 N.W.2d 918 (1979)), a negligence claim could still proceed, but only in "extreme cases where the physician's negligence is obvious." *Id.* (citing *Richards v. Mendivil*, 200 Wis. 2d 665, 548 N.W.2d 85 (Ct. App. 1996)).  At least arguably, defendants' apparent request that Teague walk on his injured leg may be such an "obvious" breach of the standard of care, but Teague does not testify that even this alleged breach caused him injury, which is required to make out a medical negligence claim.  In fact, Teague testified that he refused to stand on his leg because he could not do so.  As for the rest of defendants' acts in treating Teague, none were of such a nature that a layperson could conclude from common

24

experience that they were the result of negligence, nor even that they were errors at all. Accordingly, Teague has clearly not established a triable issue as to his medical negligence claims, and the court will grant summary judgment in favor of defendants on those claims as well.

ORDER

IT IS ORDERED that:

1) Defendants motion for summary judgment (dkt. #21) will be GRANTED.

2) Plaintiff's motion for appointment of an expert witness (dkt. #27) will be DENIED.

3) Plaintiff's motion for assistance in recruiting counsel (dkt. #28) will be DENIED.

Entered this 15th day of October, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge